CHUBB et al. v. NEW YORK CENT. & H. R. R. CO.

(District Court, S. D. New York. July 14, 1902.)

**1. ADMIRALTY—CARRIAGE OF GOODS—CAR FLOAT—LOSS OF CAR—NEGLIGENCE OF FELLOW SHIPPER—SUFFICIENCY OF EVIDENCE.**

Libelants owned certain pig lead loaded on two cars which were in process of transportation on a car float owned by a wharf transfer company. Respondent ran a train of cars onto the float when it reached a float bridge, and libelants' cars were precipitated overboard, with loss of the lead. Evidence examined, and *held* to require a decree for libelants.

Black & Kneeland, for libelants.
Herbert E. Kinney, for respondent.

ADAMS, District Judge. This is an action brought to recover for the loss incident to 902 pigs of lead getting overboard from a car float belonging to the Brooklyn Wharf Transfer Company on the 17th day of March, 1898. The lead was loaded in two cars, which were on the rear end of the float when she reached the respondent's float bridge at the foot of West 60th Street, New York City. It is alleged that a train of cars which was being pushed on the float by one of the respondent's locomotives struck a train of three cars, two being the lead cars, standing on the float, with the effect of starting the train so that one of the cars went completely off the float and the next car went partly off.

The contention of the libellants is that the respondent's agents in loading the cars upon the float negligently caused them to run with such force and violence as to push the cars containing the lead off the float.

The respondent denies the allegations of negligence on its part and alleges that the loss was occasioned by the negligence of the agents of the Brooklyn Wharf and Warehouse Company in removing certain chains which held the cars fast to the float and in placing a weak, insufficient and defective cross pin for a block or buffer between the cars and the outer end of the float, so that when the respondent's cars were being carefully and properly pushed upon the float, the cars containing the lead started with the result above mentioned. The respondent's answer does not admit its train touched the train on the float and its testimony tends to negative any contact.

I think it is probable that a correct determination of the question involved can be reached in ascertaining whether or not there was a contact, because such ascertainment will necessarily tend to credit or discredit the witnesses who have testified adversely to each other in

that connection and who were the important witnesses for the respective sides.

The float was double ended, with three tracks. At each end of the center track was a solid buffer consisting of heavy timbers bolted through the deck. This track was utilized by means of a switch at each end of the float running to the track on the starboard side. The cars on this occasion were on one of the side tracks. There is some dispute as to whether they were on the northern or southern side track as the float lay at the bridge at 60th Street but it is not important excepting so far as it may bear upon the reliability of the memories of the witnesses. The side tracks led directly off the float. They were protected at each end by removable cross pieces, made of oak timbers 11 feet long and 6 inches by 8 inches, which set in the center buffer at one end and at the other in a permanent structure of somewhat similar character built at the outer ends of the float. It is one of these pieces which the respondent alleges was insufficient and defective. I do not find, however, that such was the case. The testimony indicates that it was of good material and of sufficient strength to meet all the ordinary contingencies to which it should be subjected. As an additional means of keeping the cars from starting in case of shock or collision, heavy chains, bolted to the deck of the float about a car's length from each end, were used by fastening them around the axles of the cars nearest to the ends of the float. These cars were taken on board at Weehawken and four of these chains were then made fast to them. The wheels were also chocked. When 60th Street was reached, the chocks were removed and the chains unfastened. The respondent complains of the unfastening but the testimony shows that if they had been permitted to remain, they would have been of little service in checking the cars, and it is explained by the floatman that when some of the cars are to be removed, it is the custom of his company to move what are left to the center of the float to prevent an undue strain upon the toggles fastening the float to the bridge, which would happen if the weight of the cars was left at the outer end, and in order that the cars may be moved, it is necessary and usual to unfasten the chains. Different methods prevail with other companies but the one described was used in this case and it is testified that the remaining cars were moved forward a short distance and re-chocked. The chocking was the duty of the floatman. The handling of the cars including the braking was the duty of the train men and it is stated by the respondent's witnesses that the brakes of the cars left on the float were in good order and properly set. It is also shown by an expert called by the respondent that the brakes are more relied upon by those handling cars upon a float to keep the cars from moving than the cross pieces or chains.

It is established that notwithstanding the brakes of three cars were properly set, one of the cars got wholly into the river and one partly, and unless the libellants' testimony be true that the accident was the result of a violent blow from the respondent's train, it is practically unaccounted for. The respondent's witnesses who testified that there was no contact—one of them going so far as to say that the respondent's train did not approach within a hundred feet of the cars

on the float—were asked for an explanation of the cars getting overboard but were unable to give one other than that the cars being left at the outer end of the float, as they testified, and the weight causing a depression in that direction, there was a natural tendency of the cars, not being held by the chain, to start when the respondent's train caused a jarring by coming on the bridge and float, but such an explanation is far from satisfactory. It leaves out of consideration the fact that all of the cars were securely braked; also that the cars had withstood the jarring motion incident to a removal of six other cars, three from the northern and three from the southern side tracks, and the then depression of the outer end of the float by the weight of the remaining cars. It seems more reasonable to conclude that if the cars would start towards the outer end from a jarring, it would have been when the jarring occurred which at the same time depressed the outer end, rather than at the time when the weight of the cars going aboard tended to overcome such depression.

It is urged by the respondent that an examination of the automatic coupler on the inside car, made after the accident, showed that it had not been touched, because the knuckle was still open and if there had been any contact the two cars would have connected automatically. Even apart from the possible use of a subsequent opportunity on the part of the respondent's employés to cover up their delinquencies by arranging the coupler, the argument does not seem to be of much weight. It is admitted that the coupler did not always work correctly and it seems safer to assume that it did not in this instance, on account perhaps of the violence of the blow, than to permit such fact to control the other and more convincing circumstances. Without the violence, there does not seem to be any reasonable way of accounting for the disaster. The libellants had but one witness, the floatman, and the respondent produced several, but his account of the matter was straightforward and consistent and is supported by the circumstances. I think it is more entitled to credit than that of the others. I conclude that not only was there a contact but a violent and negligent blow for the results of which the respondent should be held.

Decree for the libellants with an order of reference.